**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LISA M. CHRISTOPHERSON,**

   **Plaintiff,**

  **vs.**            **Civ. No. 14-00152  JCH/SCY**

**SARAH POUTSCH, SUSAN PASSELL,
SUSAN CLEVELAND, and THE RIO
RANCHO PUBLIC SCHOOLS BOARD
OF EDUCATION,**

    Defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants Sarah Poutsch, Susan Passell, Susan Cleveland and Rio Rancho Public Schools' Motion for Judgment on the Pleadings and/or for Qualified Immunity and Memorandum in Support Thereof*. [Doc. 19]  Plaintiff filed a response [Doc. 33], and Defendants filed a reply [Doc. 40].  The Court issued a Memorandum Opinion and Order on March 31, 2015.  [Doc. 43]  Upon *Defendants' Unopposed Motion To Correct Citations* [Doc. 48], the Court issues this Amended Memorandum Opinion and Order.

Having reviewed the motions, briefs, and relevant law, the Court concludes that both motions should be denied in part and granted in part.

## BACKGROUND

The following is a statement of relevant facts alleged, viewed in the light most favorable to Plaintiff.

From August 2005 to August 2012 Plaintiff was employed as a certified licensed school teacher by Defendant Rio Rancho Public Schools Board of Education ("RRPS").  Plaintiff taught at Eagle Ridge Middle School ("ERMS").

Defendant Poutsch was serving as the assistant principal or principal of ERMS at the relevant times.  Defendant Passell was the Executive Director of Human Resources of RRPS. Defendant Cleveland was the Superintendent of RRPS, with authority over hiring, firing, or disciplining RRPS employees, including Plaintiff.

In May 2006 and May 2007, Plaintiff was evaluated as meeting all of the competencies required by her level of licensure.

In April 2008, parents of one of Plaintiff's students filed false reports of verbal abuse by Plaintiff, leading to RRPS issuing a written reprimand and placing Plaintiff on a Professional Growth Plan (PGP).  After Plaintiff's union grievance and a police investigation, Plaintiff was exonerated; Passell withdrew the reprimand and rescinded the PGP.

In August 2008, Plaintiff became the union representative for ERMS.  From Spring 2009 through August 2012, Plaintiff regularly attended school board meetings and spoke as the union representative.

In April 2009, Plaintiff was evaluated as meeting all of the required competencies.

In August and September 2009, Plaintiff made inquiries of the District Office of the Rio Rancho Public Schools and school board members, and made statements at school board meetings in her capacity as union representative, about:  Cleveland's use of public school funds to pay for her son's trust fund, her personal vehicle and cell phone; and Cleveland's annual trips to Sweden as non-taxable compensation.  These inquiries ultimately led to Cleveland's payment of income tax on such compensation.

In March through May of 2009, Plaintiff, acting as union representative, filed a class action grievance on behalf of a number of ERMS staff alleging that ERMS administration had not following the school's discipline matrix, thereby jeopardizing the health and safety of

teachers.  This grievance resulted in the district implementing new student disciplinary practices at ERMS between 2009 and 2012.

In January 2010, Plaintiff became a member of the negotiating team of the teachers' union.

On February 22, 2010, Plaintiff spoke at a school board meeting about large class sizes and the existence of mold at ERMS, the resultant threats to student and teacher health and safety, and the failure of RRPS's administration to address the problem.  The next day—at Cleveland's direction—ERMS Principal Morrell told Plaintiff that she was no longer to speak on behalf of ERMS at board meetings.  On February 25, ERMS Principal Morrell—at the direction of Passell and Cleveland—solicited student statements about a parent's complaint that Plaintiff made an inappropriate comment to a student.  The usual procedure, however, for handling such complaints was for the principal to meet with the parent and teacher and resolve the complaint without District involvement.  The Complaint asserts that these statements were solicited for the purpose of supporting disciplinary action against Plaintiff.

On April 12 and 26, 2010, in her capacity as union representative, Plaintiff spoke at a school board meeting about irregularities in the curriculum selection process—including a conflict of interest because the Director of Curriculum and Instruction for RRPS (Luanna Coleman) was involved in selecting a curriculum while also sitting on the Board of Directors of College Board, a company attempting to obtain a million-dollar contract for its curriculum.  The subjects of Plaintiff's statements were publicized in the local media.

Two days later, on April 28, 2010, Plaintiff received a written notice of unsatisfactory performance based on the statements RRPS solicited two months earlier, on February 25, 2010.

The Complaint asserts that in the Spring of 2010, Passell and Cleveland "were actively seeking to terminate the Plaintiff and solicited evidence to support that termination from the assistant principal and principal of ERMS, who were instructed by Defendant Passell to gather up all of their notes and other documents regarding the Plaintiff and to furnish those documents to RRPS Human Resources Department headed by Defendant Passell." [Doc. 1, p. 5, ¶ 29]

In May 2010, Plaintiff, in her capacity as union representative at a school board meeting, criticized RRPS's decision to award College Board "a three year, $1.1 million dollar contract to provide its Springboard curriculum and College Board's $1.1 million dollar gift to RRPS." [Doc. 1, p. 6, ¶ 30]

On May 19, 2010, Plaintiff was evaluated by the principal of ERMS (not a Defendant) as failing to meet all of the competencies required. At the behest of Cleveland and Passell, Plaintiff was placed on a PGP to address alleged problems with her interactions with parents and students. Placing teachers on a PGP is often done as a means of creating documentation to support termination.

On June 14, 2010, Plaintiff spoke at a board meeting about Cleveland's false statements that RRPS had obtained a waiver of the state's class size limitations. Plaintiff disclosed that no waiver had even been requested—despite Cleveland's public statements to the contrary.

In Summer 2010, Plaintiff spoke at school board meetings about improper use in a private catering business of RRPS food, equipment, and vehicle by RRPS's food service contractor. Cleveland had publicly denied this improper use. Plaintiff also spoke about that contractor's improper conversion of overdraft charges that belonged to the District.

Between July 2010 and February 14, 2011, Plaintiff continued to speak at board meetings and in news media about "instances of perceived misfeasance and malfeasance on the part of

RRPS administrators including Defendant Cleveland permitting the existence of larger than permissible class sizes in RRPS schools, RRPS' administration's failure to follow and implement RRPS discipline matrix in addressing student misbehavior and the dangers that failure created for teachers within RRPS, and the propriety of the award of a contract to Sodexo for the provision of school lunches after Sodexo had been allowed to see the other bidders' bids."  [Doc. 1, pp. 6-7, ¶ 35]  Plaintiff also made public records requests for documents on these subjects.

On January 24, 2011, Plaintiff spoke in her capacity as union representative about finding mold in ERMS classrooms—after the District had reported that there was no detectable mold at ERMS.

On February 14, 2011, Plaintiff spoke in her capacity as union representative about RRPS's mismanagement of Enchanted Mesa Daycare's funds and about RRPS issuing to employees W-2 forms "which inaccurately claimed daycare was a benefit employees paid for and therefore taxable."  [Doc. 1, p. 7, ¶ 37]

On February 25, 2011, Plaintiff received a letter of reprimand for alleged inappropriate behavior toward students based on the statements obtained one year earlier, and on other student statements RRPS had been gathering since January 2010.

Between February and March of 2011, Plaintiff, acting as union representative, contacted the United States Department of Health and Human Services about mold at ERMS.  On or about March 15, 2011, as a result of these contacts, the Department issued a letter report to RRPS which found that ERMS was a "sick" and "toxic" workplace in need of remediation.  This report contradicted Cleveland's public statements that ERMS's mold problem had been remedied.

On May 20, 2011, Plaintiff was evaluated as not meeting all of the required competencies.  The PGP initiated in May 2010 was continued.

On May 24, 2011, Plaintiff successfully challenged Passell's attempt to require RRPS teachers to attend mandatory training on the Springboard curriculum in contravention of the teachers' union contract.

Also on May 24, 2011, Passell ordered Plaintiff to attend a meeting of RRPS administrators, including Luanna Coleman and Passell.  At that meeting, Passell accused Plaintiff of providing misinformation at a January 2011 board meeting about Passell's requiring mandatory training, about class sizes, about the District's failure to get a class-size waiver, and other matters.  Passell told Plaintiff not to attend, or make statements at, any future RRPS board meetings unless she had first brought her concerns to RRPS administration.  Plaintiff agreed to do so if District officials agreed to timely respond to her emails and inquiries.

In June 2011, Cleveland and Passell appointed Poutsch as Principal of ERMS.

The Complaint asserts:  "Beginning in June of 2011, Defendants Passell, Cleveland and Poutsch began a concerted course of action intended and designed to undermine the Plaintiff's credibility and terminate the Plaintiff's employment with RRPS."  [Doc. 1, p. 8, ¶ 46]

In June 2011, Passell informed Plaintiff she would be involuntarily transferred to the position of special education math teacher at Cleveland High School.  This vacancy had not been posted in accordance with the union requirements—and the position was terminated during the 2011-2012 school year.  With the support of the teachers' union, Plaintiff challenged the transfer, causing Passell to claim that further review showed Plaintiff was not qualified for the position; Passell rescinded the involuntary transfer.

On August 22 and 25, 2011, Poutsch and the ERMS Assistant Principal evaluated Plaintiff's performance in the classroom.  On September 19, 2011, Poutsch added to Plaintiff's PGP a requirement that Plaintiff read and write reports on articles.  Poutsch also "raised a new,

baseless allegation the Plaintiff was bullying staff." [Doc. 1, p. 9, ¶ 50] On September 22, 2011, Plaintiff was again observed in her classroom by Poutsch, Assistant Superintendent Carl Leppelman, and a third District employee.

On October 21, 2011, Plaintiff met with Poutsch to review Plaintiff's compliance with her PGP after Poutsch alleged receipt of multiple complaints about Plaintiff from students, parents, and staff. Poutsch told Plaintiff that Poutsch had authority to change the terms of the PGP every month.

On November 28, 2011, after being called to the principal's office for a disciplinary infraction, a student with a history of behavior and disciplinary problems alleged that Plaintiff had intentionally struck him in the head with a cardboard partition. No action was taken by Poutsch or any RRPS official on the complaint at that time.

On January 25, 2012, Poutsch met with Plaintiff to discuss two student complaints that Plaintiff made demeaning statements to and about students, and recommended Plaintiff be issued a letter of reprimand. Poutsch documented these student complaints, falsely documenting that Plaintiff had admitted making the alleged statements and placing that documentation in a file she kept on Plaintiff.

On February 22, 2012, after efforts to informally resolve ERMS staff member concerns with RRPS administration, Plaintiff, acting as union representative, filed a grievance on behalf of more than twenty ERMS teachers and staff against Poutsch. The grievance alleged that Poutsch: bullied and intimidated staff, solicited negative statements about staff from parents and students in order to support disciplinary action, engaged in differential treatment of staff in part by disciplining staff who disagreed with her, confronted staff en mass without any prior notice,

failed to process teachers' disciplinary referrals for students and destroyed documents evidencing those referrals, and created a hostile work environment for ERMS teachers.

On Friday, February 24, 2012, ERMS Assistant Principal Rodriguez documented the November 28, 2011 student allegation that Plaintiff hit him in the head with a cardboard partition, and alleged Plaintiff had acted in a defiant manner toward her.  The same day Poutsch instructed Plaintiff to appear in Poutsch's office on Monday to review compliance with the PGP. On Monday, February 27, 2012, Poutsch placed Plaintiff on administrative leave pending investigation of what Poutsch described as multiple allegations of inappropriate and unprofessional communications and interactions with students.  Plaintiff was banned from entering school property, but was required to be available to RRPS while on administrative leave.

On February 28 and March 1, 2012, Poutsch and Assistant Principal Rodriguez solicited complaints about Plaintiff from certain students for the purpose of obtaining evidence to support Plaintiff's termination.  Poutsch and Rodriguez hand-selected students with histories of disciplinary problems; they did not talk to other students in Plaintiff's classes or to Plaintiff's colleagues.  Many of the students were pulled out in groups and were overheard comparing notes about their conversations with Poutsch and Rodriguez; some students said they were "going to get [Plaintiff] fired."  [Doc. 1, p. 11, ¶ 60]

In July 2012, a hearing was held on proposed termination of Plaintiff.  The hearing officer was the RRPS attorney who had previously advised the District on whether there was sufficient evidence to support termination, and who helped prepare the documentation used to support termination.  Prior to the hearing, Plaintiff was not provided with complete copies of the

documents used to support termination; those exhibits were provided to Plaintiff on the morning of the first day of her hearing.

On August 13, 2012, Plaintiff was terminated.

From August 13, 2012, to December 2013, Plaintiff stopped going to board meetings and stopped making Inspection of Public Records Act ("IPRA") requests to RRPS.

In January 2013, Plaintiff made an IPRA request for the results of Cleveland's investigation of the grievance Plaintiff had filed against Poutsch. Plaintiff also resumed attending and speaking at school board meetings. At the January 29, 2013 meeting, Plaintiff spoke about the fact that the school board had not followed state regulations on the procedure for selecting board members and about the apparent conflict of interest the newly added board member under discussion would have if he were to be placed on the board. Nine days after that meeting—and almost one year after Defendants knew of the facts supporting license revocation efforts—Cleveland filed an ethics complaint against Plaintiff and asked the Public Education Department ("PED") to revoke Plaintiff's teaching licenses. In June 2013, a hearing was held on the ethics complaint and revocation request.

The Complaint was filed on February 18, 2014. [Doc. 1] Defendants filed an amended answer on June 9, 2014. [Doc. 13] The Complaint includes five claims: (1) Count I—Violation of Free Speech Rights, against all Defendants; (2) Count II—Violation of Right To Associate, against all Defendants; (3) Count III—Violation of Right To Petition for Redress of Grievances, against all Defendants; (4) Count IV—Violation of Procedural Due Process, against RRPS; and (5) Count V—Violation of the Whistleblower Protection Act, against RRPS and Cleveland.

## DISCUSSION

### I.  First Amendment Claims

Defendants move for judgment on the pleadings on the First Amendment claims in Counts I, II, and III, arguing that they are entitled to qualified immunity and that the Complaint fails to meet the *Twombly* and *Iqbal* pleading standards.  Defendants raise three preliminary issues:  whether the statute of limitations bars Plaintiff from recovering for many of the acts alleged, whether Plaintiff's failure to exhaust administrative remedies bars all of her claims, and whether the Complaint states a claim of governmental liability against RRPS.

#### A.  Statute of Limitations

The allegations of the Complaint include numerous acts by Defendants, with dates from 2008 to 2013.  [Doc. 1, pp. 3-12]  Defendants argue that all claims relating to retaliatory acts occurring before February 17, 2011, must be dismissed as outside the statute of limitations. [Doc. 19, p. 8]  Plaintiff agrees that such conduct may not be used to support her damages claims, but are relevant to establishing Defendants' intent, motive, and pattern of retaliation and harassment.  [Doc. 33, p. 8]

§ 1983 does not contain a statute of limitations.  This Court takes the statute of limitations from New Mexico's personal injury statute, providing a limitations period of three years from the time the cause of action accrues.  *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), *aff'g Garcia v. Wilson*, 731 F.2d 640 (10th Cir. 1984); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014); *see* NMSA 1978, § 37-1-8 (1976).  Federal law determines the date on which the claim accrues.  *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008).

"In general, under the federal discovery rule, claims accrue and '[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'" *Alexander v. Okla.*, 382 F.3d 1206, 1215 (10th Cir. 2004) (quoting *Indus. Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994)).   In particular, a "civil rights action accrues when facts that would support a cause of action are or should be apparent."   *Id.* (internal quotation marks omitted).   The plaintiff need not have conclusive evidence of the cause of injury, or know all of the evidence ultimately relied on, before the statute of limitations is triggered.   *Nicholas v. Boyd*, 317 Fed. Appx. 773, 778 (10th Cir. 2009) (unpublished)[1].   The test for date of accrual is objective, with the focus "on whether the plaintiff knew of facts that would put a reasonable person on notice."   *Alexander*, 382 F.3d at 1216.   The plaintiff "must use reasonable diligence in seeking to discover facts giving rise to a claim for relief."   *Id.*   The "'cause of action accrues even though the full extent of the injury is not then known or predictable.'"   *Varnell*, 756 F.3d at 1216 (quoting *Wallace v. Kato*, 549 U.S. 384, 391 (2007)).   Otherwise, the statute of limitations "would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief."   *Wallace*, 549 U.S. at 391.

To determine the statute of limitations questions, it is necessary to determine when Plaintiff's causes of action accrued.   Plaintiff did not have a cause of action on a First Amendment claim until the occurrence of an adverse employment action meeting the standard of the *Garcetti/Pickering* test.   *Trant v. Okla.*, 754 F.3d 1158, 1165 (10th Cir. 2014) (listing as fourth element of *Garcetti/Pickering* test that protected speech was motivating factor in adverse employment action); *see Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Pickering v. Bd. of*

---

[1] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

*Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, (1968).  The statute of limitations issue is therefore intertwined with the question of which of Defendants' alleged actions constituted an adverse employment action, which is discussed below.  (*See* Section I(F)(4)(b), below.)  If, for instance, placement of Plaintiff on a PGP in May of 2010 constitutes an adverse employment action sufficient for Plaintiff to have brought a § 1983 claim, the statute of limitations would bar any claim relying on that May 2010 PGP as the adverse employment action, because the Complaint was filed more than three years after May 2010.  *See Varnell*, 756 F.3d at 1216 (explaining that cause of action accrues when supporting facts are or should be apparent, even if full extent of injury not yet realized).

The Complaint alleges one act which clearly satisfies the standard for an adverse employment action under *Garcetti/Pickering* and which is within the three-year statute of limitations:  Plaintiff's termination on August 13, 2012.  The Complaint was filed on February 18, 2014—less than three years later.  Any claim alleging Plaintiff's termination as the adverse employment action is timely—unless the evidence would show that the claim accrued earlier. *See Varnell*, 756 F.3d at 1216.  The Complaint includes only one count each for violations of speech, association, and petition for redress of grievances.  Since Plaintiff alleges her termination as one of the adverse employment actions under each of the three First Amendment counts, the Court concludes that the Complaint is not barred by the statute of limitations.  To decide the motion currently before the Court, it is unnecessary to decide whether additional counts could potentially have been brought based on the dates of additional potential adverse actions; it is enough for the Court to conclude that each count asserts a basis that does not violate the statute of limitations.  Whether some of Defendants' actions could not ultimately be considered in calculating any damages, because they represent the accrual of a claim before February 17, 2011,

is a determination that the Court need not make at this time, and cannot make based on the allegations of the Complaint; instead, such a determination would require detailed evidence on timing and causation.

The Court concludes that the Complaint is not subject to dismissal based on Defendants' statute of limitations argument.

### B.  Exhaustion

Defendants argue that Plaintiff's First and Fourteenth Amendment claims should be dismissed because Plaintiff did not exhaust administrative remedies.  [Doc. 33, pp. 3, 21; Doc. 40, p. 7]  Exhaustion of state administrative remedies is not required when a plaintiff asserts § 1983 claims.  *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1286 (10th Cir. 2007) (holding exhaustion not required for § 1983 claim of due process violation on employment termination); *Hopkins v. Okla. Pub. Emps. Ret. Sys.*, 150 F.3d 1155, 1160 (10th Cir. 1998) (stating that exhaustion not required because § 1983 is intended to provide supplemental remedy to any state remedy).

### C.  Governmental Liability of RRPS

Defendants argue that Counts I, II, and III should be dismissed against RRPS because there are no specific allegations in the Complaint of any official policy or custom of RRPS. [Doc. 19, p. 8]  There is no *respondeat superior* liability under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  A governmental entity may be liable for actions taken by employees in accordance with an official policy or custom, or for actions taken by its final policymakers.  *Id*. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (holding governmental entity may be liable even for a single decision by a final policymaker); *Milligan-*

*Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008) (stating that school district could only be liable under § 1983 if plaintiffs showed official policy of sexual-orientation discrimination or constitutional violation by one of district's final policymakers).

For liability under *Monell*, a plaintiff must show three specific elements:  "(1) official policy or custom, (2) causation, and (3) state of mind."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  An official policy "must be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a governmental entity's] officers."  *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999) (internal quotation marks omitted).  A governmental entity may also be liable "if the discriminatory practice is so permanent and well settled as to constitute a custom or usage with the force of law."  *Id*. (internal quotation marks omitted).  The plaintiff must demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged— demonstrating "a direct causal link between the municipal action and the deprivation of federal rights."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

The Complaint does not explicitly allege that RRPS had an official anti-union policy or custom.  Plaintiff's response contends that the Complaint adequately alleges a *Monell* claim, arguing that "Plaintiff has identified throughout her Complaint facts supporting a claim that the Defendants maintained and implemented a strong anti-union policy and practice, which led directly to the adverse employment actions against Plaintiff."  [Doc. 33, p. 7; *see* Doc. 33, p. 35 (contending that "Plaintiff has identified in her Complaint an anti-union policy and practice by Defendant RRPS and Defendant Cleveland that led directly to Plaintiff's termination")] Plaintiff's response contends that it "can be reasonably inferred" that RRPS "had a custom or

policy of being hostile to labor unions and labor union activities."  [Doc. 33, p. 36]   The Complaint does not even include a conclusory assertion that RRPS had a custom or policy of hostility to labor unions.   And if it did, a conclusory assertion without supporting factual allegations would not be sufficient to state a claim.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (stating that court does not accept as true a legal conclusion, even if couched as factual allegation).   Even a liberal construction of the Complaint fails to reveal an allegation of an official anti-union policy or any factual allegations showing widespread and pervasive anti-union acts by RRPS.  *See Murrell*, 186 F.3d at 1249.

Nor does the Complaint contain allegations to "'demonstrate a direct causal link'" between an anti-union policy and the deprivation of Plaintiff's rights. *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 404).  Plaintiff contends that directives to stop speaking at school board meetings, poor performance evaluations, and termination occurred after her union-related activity.  The Court concludes that chronology alone cannot satisfy the "'rigorous standards'" of causation imposed on such claims to ensure that a governmental entity "'is not held liable solely for the actions of its employee.'" *Id*. (quoting *Brown*, 520 U.S. at 405).  Possible causes for the adverse actions alleged here could include personal animosity, a desire to avoid a disruptive employee, or poor job performance.  The Complaint fails to allege that an anti-union policy or custom was the "moving force."

Taking all well-pleaded factual allegations as true, the Court concludes that the Complaint fails to "raise a right to relief above the speculative level." *Twombly* 550 U.S. at 555. Pleading facts that are "'merely consistent with'" liability, the Complaint "'stops short of the line between possibility and plausibility'" of entitlement to relief.  *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 557).  Because the Complaint shows no more than "a sheer possibility" that RRPS is liable, the Complaint cannot survive Defendants' motion to dismiss.

The Court will dismiss Counts I, II, and III against RRPS for failure to state a claim.

Recognizing the Complaint's deficiency, Plaintiff asks for permission to amend.  [Doc. 33, p. 36 n.6]  The Court grants Plaintiff leave to amend the Complaint.  *See* D.N.M.LR-Civ. 15.1; *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice requires.").  An amended complaint shall be filed on or before April 14, 2015.

### D.  Legal Standard for Judgment on the Pleadings

A motion for judgment on the pleadings may be made after the pleadings are closed, but early enough not to delay trial.  Fed. R. Civ. P. 12(c).  The same standard applies to a Rule 12(b)(6) motion and a Rule 12(c) motion.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002); *Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1160 (10th Cir. 2000).

"The correct standard for reviewing a motion to dismiss in a qualified-immunity case is the same as for dismissals generally."  *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008).  The court assesses the legal sufficiency of the allegations contained within the four corners of the complaint.  *Id*.  Rule 8 requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  All well-pleaded facts must be accepted as true; these facts must be viewed in the light most favorable to the plaintiff, and all reasonable inferences must be allowed in favor of the plaintiff.  *Archuleta*, 523 F.3d at 1283.  These standards apply only to well-pleaded facts, however; legal conclusions and conclusory allegations are not accepted as true.  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009); *Archuleta*, 523 F.3d at 1283.  The court also disregards a legal conclusion couched as a factual allegation.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The complaint "does not need detailed factual allegations," but the factual allegations "must be enough to raise a right to relief above the speculative level."  *Id*.  The complaint must go beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  Conclusory assertions unsupported by factual allegations are not sufficient.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see Iqbal*, 556 U.S. at 678 (stating that "'naked assertion[s]' devoid of 'further factual enhancement'" are not sufficient (quoting *Twombly*, 550 U.S. at 557)).  The Tenth Circuit stated that the *Twombly* Court sought to "find a middle ground between 'heightened fact pleading,' which is expressly rejected," and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" which are insufficient.  *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570, 555).

The allegations of fact must "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see id.* at 562-63 (rejecting the "no set of facts" standard in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *Robbins*, 519 F.3d at 1247 (explaining that *Twombly* rejected "no set of facts" standard).  Looking within the four corners of the complaint, the court determines whether there are "sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations."  *Archuleta*, 523 F.3d at 1281, 1283 (quoting *Twombly*, 550 U.S. at 556).  The Tenth Circuit observed that "plausible" cannot mean "likely to be true," but "must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Robbins*,

519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."  *Id.* Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In addition to weeding out claims lacking a reasonable prospect of success, the requirement of plausibility serves to inform the defendant of the actual grounds of the claim. *Robbins*, 519 F.3d at 1248.

Under § 1983, a plaintiff must establish:  "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a person (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia."  *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002) (internal quotation marks omitted).  Causation "'is an essential element of a section 1983 cause of action.'"  *Bell v. Whetsel*, 1999 WL 59663, *1 (10th Cir. 1999) (unpublished) (quoting *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)); *see Hayden v. Nevada Cnty.*, 664 F.3d 770, 773 (8th Cir. 2012) (quoting *Morton*, 793 F.2d at 187, for principle that causation is essential element).

"Qualified immunity is designed to shield public officials from liability and ensure 'that erroneous suits do not even go to trial.'"  *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 779 (10th Cir. 1993)).  In addition, qualified immunity is designed to prevent government officials from facing the other burdens of litigation.  *Iqbal*, 556 U.S. at 672.  The Supreme Court "has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except 'the plainly incompetent or those who knowingly violate the law,'" so that officers "might not be

18

unduly 'inhibit[ed] . . . in performing their official duties.'" *Wilson v. City of Lafayette*, 510 Fed. Appx. 775, 780 (10th Cir. 2013) (unpublished) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)).  "The *Twombly* standard may have greater bite in [qualified immunity cases], appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity 'at the earliest possible stage of a litigation.'" *Robbins*, 519 F.3d at 1249 (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)).

To survive a motion to dismiss based on a claim of qualified immunity, the plaintiff bears a "heavy two-part burden." *Archuleta*, 523 F.3d at 1283.  "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right." *Id.*  § 1983 creates no substantive rights, but "merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  The validity of a claimed constitutional violation is judged "by reference to the specific constitutional standard which governs that right." *Id.* at 394.  The second part of the plaintiff's burden is to "show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Archuleta*, 523 F.3d at 1283.  The "'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Albright*, 51 F.3d at 1535 (quoting *Anderson*, 483 U.S. at 640).  A plaintiff can carry his burden of showing that a right is clearly established by citing Supreme Court or Tenth Circuit caselaw on point, or by demonstrating that the weight of authority from other circuits shows the right to be clearly established. *Archuleta*, 523 F.3d at 1283; *Albright*, 51 F.3d at 1535.  If the plaintiff fails to carry either part of this two-part burden, the defendant is entitled to qualified immunity. *Archuleta*,

523 F.3d at 1283.  If the complaint fails to properly allege a violation of a constitutional or statutory right, the court need not reach the question of whether the law was "clearly established." *Butler v. Rio Rancho Pub. Sch. Bd.*, 341 F.3d 1197, 1200 (10th Cir. 2003).

### E.  Specific Allegations as to Each Defendant

Defendants argue that the Complaint should be dismissed for failure to meet the pleading standards of *Twombly* and *Robbins* because it makes only conclusory allegations without specific allegations as to each Defendant.  [Doc. 19, p. 10]  A complaint naming several individuals as defendants must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her."  *Robbins*, 519 F.3d at 1249-50; *Schell v. Evans*, 550 Fed. Appx. 553, 557 (10th Cir. 2013) (unpublished).   "The complaint must also demonstrate personal involvement on the part of each individual."  *Id.*

With respect to Cleveland, the Complaint alleges that she:  directed Principal Morrell to tell Plaintiff to stop speaking at school board meetings [Doc. 1, ¶ 21]; directed others to gather evidence for the purpose of supporting Plaintiff's termination [¶¶ 22-23, 29]; directed that Plaintiff be placed on a PGP [¶¶ 31-32]; and caused Plaintiff to be given a letter of reprimand [¶¶ 22-23, 38].  In addition, after Plaintiff was terminated, the Complaint alleges that Cleveland violated her First Amendment right as a private citizen by seeking to have Plaintiff's teaching licenses revoked.  [¶ 67]

With respect to Passell, the Complaint alleges that she:  told Plaintiff not to attend or speak at school board meetings without having first raised any concerns to RRPS administration [Doc. 1, ¶ 44]; directed others to gather evidence for the purpose of supporting Plaintiff's termination [¶¶ 22-23, 29]; directed that Plaintiff be placed on a PGP [¶¶ 31-32]; attempted to effect an involuntary transfer of Plaintiff to a position about to be eliminated [¶¶ 47-48]; and as

Executive Director of Human Resources had some responsibility for making and implementing personnel decisions, including the imposition and continuation of Plaintiff's PGP, placement of Plaintiff on administrative leave, issuance of a letter of reprimand, and termination of Plaintiff [¶ 4]. While recognizing that some of the latter allegations do not explicitly state Passell's role, the Court concludes that the Complaint as a whole adequately alleges what Passell did.

With respect to Poutsch, the Complaint alleges that she: increased the requirements of Plaintiff's PGP and told Plaintiff she could change the terms every month [Doc. 1, ¶¶ 50, 52]; falsified documentation of student complaints against Plaintiff [¶ 55]; placed Plaintiff on administrative leave [¶ 59]; and inappropriately conducted an investigation into student complaints, soliciting student statements in a manner designed to support termination rather than to impartially acquire evidence [¶ 60].

The Court concludes that the Complaint satisfies the *Twombly/Robbins* standard of alleging "*who* did *what* to *whom*."

Defendants also argue that, taking as true the Complaint's well-pleaded factual allegations, the Complaint does not show that any individual Defendant could have violated a clearly established right. [Doc. 19, p. 26] Defendants contend that the vast majority of allegations involve administrative duties of RRPS staff in operating ERMS, supervising teachers, and educating students. The Court agrees that investigation of parent and student complaints, overseeing Plaintiff's teaching practices, and addressing disciplinary issues are generally not actions which violate a constitutional right; however, the Complaint also alleges that Plaintiff was directed not to speak at board meetings and that Defendants each performed actions retaliating for Plaintiff's speech. Defendants do not seriously dispute that the First Amendment

rights at issue were clearly established.[2]  Plaintiffs' response argues that these rights were clearly established, and the Court concludes that they were.   A reasonable official would have understood, at the relevant times, that retaliating against a teacher for exercise of her rights of speech, association, and petitioning for redress of grievances would violate the First Amendment.  *See, e.g.*, *Schuler v. City of Boulder*, 189 F.3d 1304, 1309 (10th Cir. 1999) (regarding free speech); *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 (10th Cir. 1990) (right to associate); *Cillo v. City of Greenwood Village*, 739 F.3d 451, 460 n.16 (10th Cir. 2013) (right to associate); *Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996) (right to petition for redress of grievances).

Arguing that only Cleveland had authority to discharge Plaintiff, Defendants further contend that Passell and Poutsch cannot be liable for any § 1983 claim relating to Plaintiff's termination.  [Doc. 19, pp. 12, 14]  But one who "takes an active part" in a constitutional violation may also be liable.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004).  "§ 1983, by its terms, applies not only to a person who 'subjects,' but also to any person who '*causes to be subjected* ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Id.* (quoting § 1983 (emphasis added)).  Liability under § 1983 is not limited to the one person primarily responsible for a constitutional deprivation, but extends "to all those who were the 'cause' of deprivations of constitutional rights."  *Pierce*, 359 F.3d at 1292.  Defendants acknowledge that Passell and Poutsch could make recommendations regarding employee decisions.  [Doc. 19, p. 12]  A subordinate, who was not the decisionmaker regarding the plaintiff's termination, may still be liable if she "possessed a retaliatory motive which set in motion the events that ultimately led to" the adverse employment

---

[2] Defendants agree that the right to be free from retaliation for participating in a union was clearly established at the time.  [Doc. 40, p. 16]

action. *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005).   The Complaint alleges that, beginning in June 2011, Cleveland, Passell, and Poutsch engaged in "a concerted course of action intended and designed to undermine the Plaintiff's credibility and terminate the Plaintiff's employment with RRPS."   [Doc. 1, ¶ 46]   The allegation that Defendants acted in concert, together with factual allegations allowing an inference of coordination, supports the conclusion that Passell and Poutsch may be liable for contributing to Plaintiff's termination even in the absence of a fully supported separate claim of conspiracy.   *See Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010) (stating complaint must allege specific facts showing agreement and concerted action; conclusory allegations of conspiracy insufficient to state a claim).   The Complaint alleges that Passell and Poutsch had a retaliatory motive and participated in actions that ultimately led to Plaintiff's termination.   *See Maestas*, 416 F.3d at 1191.   In addition, Plaintiff argues that Passell and Poutsch may be liable on the basis of adverse actions short of termination.   [Doc. 33, pp. 36-37]

The Court concludes that the Complaint meets the pleading standard of *Twombly* and *Robbins*, with respect to all three individual Defendants.

## F.  Count I

The Complaint does not state whether Cleveland, Passell, and Poutsch are sued in their individual or official capacities.   Defendants argue that official capacity claims should be dismissed as duplicative of claims against RRPS.   [Doc. 19, pp. 8-9]   Plaintiff's response states that she asserts no official capacity claims.   With this clarification, the questions before the Court are whether the Complaint sufficiently states claims against Cleveland, Passell, and Poutsch in their individual capacities and whether they are entitled to qualified immunity.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Under certain circumstances the First Amendment protects a public employee's right "to speak as a citizen addressing matters of public concern." *Id.* Because government employers, "'like private employers, need a significant degree of control over their employees' words and actions,' not every restriction on a public employee's speech amounts to a deprivation of First Amendment rights." *Seifert v. Unified Gov. of Wyandotte Cnty./Kansas City*, ___ F.3d ___, ___, 2015 WL 846208, *7 (10th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 418). The First Amendment requires a careful balancing of the interests of the employee in commenting on matters of public concern and the governmental employer's interest in promoting the efficiency of the public services it provides. *Id.*

The five-pronged *Garcetti/Pickering* analysis governs Plaintiff's First Amendment retaliation claim:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern;
> (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
> (4) whether the protected speech was a motivating factor in the adverse employment action; and
> (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Trant v. Okla.*, 754 F.3d 1158, 1165 (10th Cir. 2014); *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). The first three elements are issues of law for the Court to decide. *Id.* The fourth and fifth elements are factual issues typically decided by the jury. *Trant*, 754 F.3d at 1165. Under the fourth prong, it is Plaintiff's burden to establish both causation and an adverse employment action. *Couch v. Bd. of Trustees*, 587 F.3d 1223, 1236 (10th Cir. 2009). The fifth element is an affirmative defense, on which Defendants bear the burden of proving by a

preponderance of the evidence that they would have reached the same employment decision in the absence of the protected speech. *Meyers v. E. Okla. Cnty. Tech. Ctr.*, 776 F.3d 1201, 1206 (10th Cir. 2015); *Trant*, 754 F.3d at 1167.

### (1) Speech pursuant to official duties

A public employee making statements pursuant to her official duties is not speaking as a citizen for First Amendment purposes; such speech is not protected. *Seifert*, 2015 WL 846208, *7.  "The official-duties question is a practical one that turns on whether the speech was commissioned by the employer" and "reasonably contributes to or facilitates the employee's performance of the official duty." *Id.* (internal quotation marks omitted).  Speech concerning information acquired by means of public employment is not necessarily speech pursuant to official duties. *Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*; *Seifert*, 2015 WL 846208, *9 (holding that speech may concern employee's work, but if "not part of it" constitutes citizen speech).

The Complaint includes a long list of incidents and topics of speech, including:  the mold issue at ERMS, Cleveland's compensation and tax liabilities, curriculum selection irregularities and conflict of interest of a board member, class size, and improper use of RRPS facilities and equipment by RRPS food service contractors.  Defendants do not argue that Plaintiff's speech on these topics was made pursuant to her official duties.  The Court concludes that these speech activities did not stem from Plaintiff's job and were not the type of activities that she was paid to perform. *See Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007).  Consideration of the entities to which Plaintiff reported her concerns confirms this conclusion.  Plaintiff did not

report to her immediate superiors—presumably ERMS's Principal or Assistant Principal—but went outside the chain of command to report to the United States Department of Health and Human Services ("USDHHS").  It was certainly not within Plaintiff's official duties to report to the USDHHS; such reporting confirms that this speech was not made pursuant to her official duties.  *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332-33 (10th Cir. 2007); *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 716 (10th Cir. 2010).

Since Plaintiff's statements were not made pursuant to her official duties, they merit First Amendment protection.  *See Trant*, 754 F.3d at 1165.

### (2) Matter of public concern

Speech is a matter of public concern if it is "'of interest to the community, whether for social, political, or other reasons.'"  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).  The Court may consider the speaker's motive, and "'whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'"  *Id.* (quoting *Lighton*, 209 F.3d at 1225).  "Statements revealing official impropriety usually involve matters of public concern."  *Id.*; *see Trant*, 754 F.3d at 1165 (asserting irregularity in grand jury investigation into public agency's alleged misconduct).  In contrast, speech airing "'grievances of a purely personal nature' typically does not involve matters of public concern"; this includes grievances about internal department affairs, disputes over the term of employment, and workplace frustration.  *Brammer-Hoelter*, 492 F.3d at 1205 (quoting *Lighton*, 209 F.3d at 1225).  In determining whether a matter of public concern is involved, the Court considers "'the content, form, and context of a given statement.'"  *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).  An employee's speech does not

automatically constitute a matter of public concern "merely because it is union-related." *King v. Downing*, 58 Fed. Appx. 830, 833 n.1 (10th Cir. 2003) (unpublished).  "It can be difficult to draw 'the thin line between a public employee's speech which touches on matters of public concern, and speech from the same employee which only deals with personal employment matters . . . .'"  *Oleynikova v. Bicha*, 453 Fed. Appx. 768, 774 (10th Cir. 2011) (unpublished) (quoting *Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir. 1990)).

Defendants agree that some of Plaintiff's speech involved matters of public concern:  the mold issue at ERMS; inquiries about Cleveland's compensation and possible tax consequences; irregularities in the curriculum selection process and conflict of interest of the curriculum director; concerns about class size; and concerns about improper use of RRPS facilities and equipment by RRPS food service contractors.  [Doc. 19, p. 16]  Defendants argue that other subjects of Plaintiff's speech do not involve matters of public concern:  discipline of employees including Plaintiff herself, and student discipline.  [Doc. 19, p. 16]

The mold issue at ERMS constitutes a matter of public concern.  Mold is of interest to the community; it could substantially and detrimentally affect the health and welfare of the children, staff, and teachers at ERMS.  *See Morfin v. Albuquerque Pub. Schs.*, 906 F.2d 1434, 1437-38 (10th Cir. 1990).  Plaintiff's allegations that Cleveland made false public statements that the mold problem had been remedied also raises questions of official impropriety and misconduct— matters of public concern.  *See Brammer-Hoelter*, 492 F.3d at 1205.  As allegations of official impropriety and misconduct, Plaintiff's speech on the following topics involved matters of public concern:  Plaintiff's inquiries about Cleveland's compensation and tax consequences; false statements that a waiver of class-size restriction had been obtained; and charges that RRPS food service contractors were improperly using RRPS facilities and equipment in a private catering

27

business.  *See id.*  Allegations that class-size restrictions were violated also raises a matter of public concern in its own right—as a matter of interest to the public in general and parents in particular.

The Court agrees that discipline of Plaintiff, including action taken because of alleged inappropriate behavior toward students, involves "'grievances of a purely personal nature,'" which typically do not involve matters of public concern.  *Brammer-Hoelter*, 492 F.3d at 1205 (quoting *Lighton*, 209 F.3d at 1225).  Similarly, the issue of Passell's attempt to require RRPS teachers to attend mandatory training on the Springboard curriculum in contravention of the teachers' union contract is a grievance about internal department affairs or about the terms of employment, not a matter of public concern.  *See id.*

The Court concludes that the Complaint alleges that Plaintiff spoke on a number of matters of public concern.

### (3) Whether government employer's interest outweighs plaintiff's free speech interest

"The only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'"  *Trant*, 754 F.3d at 1166 (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)).  The manner, time, and place of the employee's expression are relevant.  *Id*.  Some relevant factors include whether the statement impairs discipline or co-worker harmony, has a detrimental impact on working relationships, or impedes performance of the speaker's duties or interferes with the regular operation of the enterprise.  *Id*.  The employer need not show that the speech in fact disrupted internal operations and employment relationships, but only "that the speech could *potentially* become so disruptive to [ ] operations as to outweigh" Plaintiff's interest in speaking.  *Id*.

There is no indication in the pleadings or briefs, at this stage, that Plaintiff's speech disrupted her duties as teacher or the operation of the school or in other ways was so disruptive that her interest was outweighed by her employer's interest. *See Casey*, 473 F.3d at 1333 (giving as example of level of sufficient disruption activities that impaired proper functioning office work and morale).

### (4) Causation and adverse employment action

Under the fourth prong of the *Garcetti/Pickering* test, it is Plaintiff's burden to establish both an adverse employment action and causation. *Couch v. Bd. of Trustees*, 587 F.3d 1223, 1236 (10th Cir. 2009).

### (a) Causation

Defendants argue that the Complaint fails to adequately assert a causal connection between Plaintiff's First Amendment activities and adverse actions, pointing out that Plaintiff joined the teachers' union in 2008 and was not terminated until 2012. [Doc. 19, p. 11; Doc. 40, p. 12] Plaintiff responds that the allegations "show that each, individual Defendant took specific actions against the Plaintiff shortly after and in close temporal proximity to the Plaintiff making statements about matters of public concern . . . and that those actions were part of a pattern of retaliatory actions by Defendants Cleveland and Passell that began in 2010." [Doc. 33, p. 17]

The plaintiff is required to show "'causation—that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.'" *Couch v. Bd. of Trustees*, 587 F.3d 1223, 1236 (10th Cir. 2009) (quoting *Maestas*, 416 F.3d at 1188 & n.5); *cf. Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 483-84 (10th Cir. 2011) (affirming summary judgment for defendants when plaintiff failed to identify evidence from which reasonable factfinder could

conclude protected speech was a motivating factor).   There is no precise definition of "substantial motivating factor."  *Maestas*, 416 F.3d at 1188.  The employee "'need not prove his speech was the sole reason for defendants' action,'" nor is she required to show "but-for" causation.  *Id*. (quoting *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1554 (10th Cir. 1989)).  Instead, the plaintiff must show that the protected speech played a substantial part in the employer's decision.  *Id*.

Motivation is a question of fact; the issue is whether an inference of impermissible motive could be made from the factual allegations.  *Cillo v. City of Greenwood Village*, 739 F.3d 451, 463 (10th Cir. 2013).  The timing of events, together with additional evidence, may allow a plaintiff to carry her burden of proof on causation.  A short time between a plaintiff's speech and an adverse action may be sufficient, standing alone, to show causation.  *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (stating that six week time period may be sufficient alone); *Seifert*, 2015 WL 846208, *14 (holding that five day time period supports inference of retaliatory motive).  Evidence of a long delay—generally more than three months—between the employee's speech and adverse employment action, or evidence of intervening events, tends to undermine any inference of retaliatory motive and to weaken the causal link.  *Couch*, 587 F.3d at 1236; *Cypert*, 661 F.3d at 484.

Even if the temporal proximity is not close enough by itself to allow an inference of causation, the timing together with additional evidence may support the inference.  *See Seifert*, 2015 WL 846208, *10-12 (holding that adverse action six days later, together with explanation of which reasonable factfinder could be dubious, was sufficient on summary judgment to satisfy fourth *Garcetti/Pickering* element).  Evidence that the plaintiff's speech implicates the employer in wrongdoing or serious misconduct provides support for an inference of retaliatory motive and

strengthens the causal connection.  *Maestas*, 416 F.3d at 1189; *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005).   On the other hand, intervening circumstances may undermine any inference of retaliatory motive and weaken the causal link.  *Cypert*, 661 F.3d at 484 (board's investigation led to conclusion district was in financial crises); *Maestas*, 416 F.3d at 1189.

Plaintiff argues that temporal proximity and additional factors sufficiently show a causal connection.  [Doc. 33, pp. 20-21]  Plaintiff's response identifies the following incidents of speech and alleged adverse actions as demonstrating causal connection through temporal proximity:

(a)  The Complaint alleges that Plaintiff spoke at a school board meeting about large class size and the existence of mold at ERMS on February 22, 2010, and that one day later Cleveland directed ERMS Principal Morrell to tell Plaintiff that she was no longer to speak at board meetings on behalf of ERMS.  [Doc. 1, p. 4, ¶¶ 20-21]

(b)  In April and May 2010, at school board meetings, Plaintiff raised irregularities in the curriculum selection process—including a conflict of interest when the RRPS Curriculum Director was on the Board of Directors of College Board—and criticized RRPS's decision to award a $1.1 million dollar contract to College Board for its curriculum.  [Doc. 1, pp. 5-6, ¶¶ 25-26, 30]  On May 19, 2010, Cleveland and Passell directed Plaintiff to be placed on a PGP after she was evaluated as failing to meet all of the required competencies; a PGP is often used to create documentation to support a teacher's termination.  [Doc. 1, p. 6, ¶¶ 31-32]

(c)  At a February 14, 2011 school board meeting, Plaintiff raised questions of RRPS's mismanagement of daycare funds and tax irregularities.  [Doc. 1, p. 7, ¶ 37]  Eleven days later, Plaintiff received a letter of reprimand for alleged inappropriate behavior that occurred one year earlier.  [Doc. 1, p. 7, ¶ 38]

(d)  Between February and March 2011, Plaintiff contacted the United States Department of Health and Human Services (DHHS) about mold at ERMS.  [Doc. 1, p. 7, ¶ 39]  On or about March 15, 2011, DHHS issued a report to RRPS finding ERMS to be a "sick" and "toxic" workplace in need of remediation, in direct contradiction to Cleveland's public statements that the mold problem had been remedied.  [Doc. 1, p. 7, ¶ 40]  Plaintiff's response alleges that about two months later, Cleveland and Passell directed that Plaintiff's PGP be continued another year; however, the Complaint uses the passive voice without alleging that Cleveland or Passell caused the PGP to be continued.  [Doc. 33, p. 20; Doc. 1, p. 7, ¶ 41]  Since the Complaint does not allege that one of the Defendants was responsible for continuing the PGP, the temporal proximity of these events does not support a causal connection.

(e)  On May 24, 2011, Plaintiff challenged Passell's attempt to require RRPS teachers to attend mandatory training in contravention of their contract; on that day Passell ordered Plaintiff to attend a meeting of RRPS administrators, at which Passell told Plaintiff not to attend or make statements at any future RRPS board meetings without having first raised her concerns with RRPS administrators.  [Doc. 1, pp. 7-8, ¶¶ 42-44]  The temporal proximity alone does not support a causal connection, however, because the Complaint is not specific about the date of that meeting and the May 24, 2011 challenge did not involve a matter of public concern.  *See Brammer-Hoelter*, 492 F.3d at 1205 (stating that matters of public concern do not include grievances about internal department affairs and disputes over terms of employment).

(f)  On February 22, 2012, Plaintiff filed a union grievance against Poutsch, alleging: bullying and intimidation; solicitation of negative statements with intention to support disciplinary actions; biased treatment of staff who disagreed with Poutsch; failure to process disciplinary referrals of students and destroying the documentation; and creating a hostile work

environment.  [Doc. 1, p. 10, ¶ 56]  Several days later, Poutsch placed Plaintiff on administrative leave and began an investigation which the Complaint alleges was conducted in a biased and unreasonable manner, with the purpose of obtaining evidence to support Plaintiff's termination. [Doc. 1, pp. 10-11, ¶¶ 59-60]  Some parts of this grievance do not involve matters of public concern.  *See Brammer-Hoelter*, 492 F.3d at 1205 (stating that matters of public concern do not include grievances about internal department affairs, disputes over the term of employment, and workplace frustration).

(g)   After a lapse of four or five months, Plaintiff resumed attending and speaking at school board meetings.  [Doc. 1, p. 11, ¶¶ 65-66]  On January 29, 2013, Plaintiff criticized the school board's failure to follow state regulations regarding selection of board members.  [Doc. 1, pp. 11-12, ¶ 66]  Nine days later—and almost one year after Defendants knew of the supporting facts—Cleveland filed an ethics complaint against Plaintiff and asked the New Mexico Public Education Department to revoke Plaintiff's teaching licenses.  [Doc. 1, p. 12, ¶ 67]

Some of these incidents provide little or no support for an inference of retaliation from temporal proximity alone; the strength of some is questionable because they occurred before the statute of limitations date (February 17, 2011), or because the speech preceding the alleged adverse action did not involve matters of public concern.  But the Complaint provides additional evidence of causation.  Evidence that the employer expressed opposition to the employee's speech—here, by telling Plaintiff not to appear or speak at school board meetings—provides additional evidence of causation.  *See Maestas*, 416 F.3d at 1189.  Allegations of speech implicating the employer in official misconduct also constitutes additional evidence of causation and supports an inference of retaliatory motive.  *See Maestas*, 416 F.3d at 1189; *Baca*, 398 F.3d at 1221.  Here, the Complaint alleges mismanagement of funds, false public statements of

33

remediation of the mold problem, falsified documentation, conflict of interest and irregularities in curriculum selection, and failure to follow state regulations in selecting school board members.  The Complaint does not rely on temporal proximity alone, but provides additional evidence supporting a causal connection—as required.  *See Cypert*, 661 F.3d at 484.

For purposes of deciding the current motion, it is sufficient for the Court to conclude that the Complaint adequately alleges a causal connection supporting the single count of retaliation for exercise of free speech.  The Court is persuaded that there is enough in the Complaint to meet the "causal connection" element—particularly considering the allegations of two explicit directives not to speak at board meetings and a number of allegations of official misconduct or wrongdoing, together with a potential pattern of retaliation.[3]

In addition, as discussed further below, the incident discussed in (g) above, by itself, supports the single count of retaliation for exercise of free speech (as against Cleveland alone, however).  The *Garcetti/Pickering* analysis is not applicable to Plaintiff's speech as a private citizen, after her termination.  The Complaint alleges a single count of retaliation for exercise of the right to free speech, which could be supported either by speech while an employee or by speech as a private citizen no longer employed by RRPS.[4]

The two explicit directives not to speak at school board meetings provide powerful evidence of causation and allow a reasonable inference of retaliatory motive.  The Court concludes that the Complaint passes muster on the causation element in the fourth *Garcetti/Pickering* factor.  Additional support for an inference of causation is provided by:

---

[3] Whether, on a summary judgment motion or at trial, Plaintiff could tie together incidents occurring over so many years so as to support a claim that they, together, led to her termination is not clear.  At this point the Court merely concludes that there is enough to survive a motion for judgment on the pleadings.
[4] *See* Section I(F)(6) below ("First Amendment Claims as a Private Citizen Under Count I").

Plaintiff's continued criticism of Defendants, particularly Plaintiff's accusations of misconduct and wrongdoing; the series of challenges followed by Defendants' disciplinary and discouraging conduct, even if not all rose to the level of "adverse actions"; and some temporal proximity.

**(b) Adverse employment action**

Count I asserts that Plaintiff "spoke out publicly on matters of public concern in her capacity as a union representative," and that her "protected speech was a substantial, motivating factor in the Defendants' taking of disciplinary action against the Plaintiff, terminating her employment, seeking to have her teaching licenses revoked by State authorities, and taking other adverse action against the Plaintiff."  [Doc. 1, pp. 12-13]  Defendants' motion interprets Count I as claiming retaliation by discharging Plaintiff, because that is "the only potentially actionable adverse employment action."  [Doc. 19, pp. 7, 13]  Defendants argue that other allegations do not rise to the level of adverse actions in this context:  negative performance evaluations, imposition of Professional Growth Plan ("PGP"), classroom observation, and administrative leave.

Plaintiff's response states that Defendants' motion "mischaracterizes the Plaintiff's First Amendment claims" by asserting that Plaintiff claims she was retaliated against only when Defendants discharged her.  [Doc. 33, p. 5]  Plaintiff states that "Defendants retaliated against her when they took a series of detrimental actions," including:  ordering Plaintiff not to speak at school board meetings (Feb. 23, 2010; and May 2011); issuing her a letter of reprimand; continuing the PGP for additional school years; attempting to involuntarily transfer Plaintiff "to a position of employment that was done away with shortly thereafter"; placing Plaintiff on administrative leave and soliciting evidence to support discharge; and finally discharging Plaintiff and then seeking revocation of her teaching licenses.  [Doc. 33, pp. 5-6]

Plaintiff cites caselaw to support her claim that employment actions short of termination may support a First Amendment retaliation claim.   [Doc. 33, p. 24]   As the Tenth Circuit observed, the Supreme Court noted that First Amendment protection "extends beyond employer conduct amounting to termination of employment or the substantial equivalent."   *Couch*, 587 F.3d at 1237; *see Rutan v. Repub. Party*, 497 U.S. 62, 75 (1990).   "'[T]here are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy.'"   *Couch*, 587 F.3d at 1237 (quoting *Rutan*, 497 U.S. at 75).   The standard for an adverse employment action is whether it "would 'deter a reasonable person from exercising his First Amendment rights.'"   *Id*. at 1238 (quoting *Brammer-Hoelter*, 492 F.3d at 1208); *see Hook v. Regents of Univ. of Cal*, 394 Fed. Appx. 522, 534-35 (10th Cir. 2010); *Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1103 & n.3 (D.N.M. 2011). An action must be materially adverse to meet this standard; a trivial act is not sufficient.   *Couch*, 587 F.3d at 1237-1239; *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Plaintiff's termination, by itself, obviously meets the standard of an "adverse employment action."   In determining whether an employer's conduct is actionable, "'[c]ontext matters.'" *Couch*, 587 F.3d at 1238 (quoting *White*, 548 U.S. at 69).   Conduct that may not be actionable by itself may amount to adverse employment action when considered together with other negative conduct.   *Id*. at 1239.   The Court must consider thoroughly the "'constellation of surrounding circumstances, expectations, and relationships'" culminating in negative consequences to the employee.   *Barone v. United Airlines, Inc.*, 355 Fed. Appx. 169, 183 (10th Cir. 2009) (quoting *White*, 548 U.S. at 69) (internal quotation marks omitted). Applying these principles, the Court concludes that additional actions, considered in context and as parts of a series of negative actions, also constituted adverse employment actions—particularly the negative performance

evaluations in later years, and placement on administrative leave.  *See Brammer-Hoelter*, 492 F.3d at 1208 (holding that negative performance evaluations constituted adverse employment actions); *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004) (recognizing that evaluation lower than previous evaluations by itself cannot be assumed to be negative for purposes of retaliation claim); *Baca*, 398 F.3d at 1220-21 (stating that reprimand in contravention of protocol may support First Amendment retaliation claim); *Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999) (reprimanding employee, transferring her, removing job duties constitute adverse employment actions under First Amendment claim).  The Court concludes that the Complaint alleges a series of negative actions, which rise to a level of seriousness that would deter a reasonable person from exercising her First Amendment rights.

The Court cautions that it is not currently holding that Plaintiff may be able to recover based on all of these negative actions.  As noted above, if further development of evidence shows that a cause of action based on particular negative conduct accrued before February 17, 2011, the statute of limitations may bar any recovery based on that conduct; this is not a determination that must be, or can be, made at this stage of the proceeding.  All that the Court necessarily determines at present is that the Complaint is adequate to survive the motion for judgment on the pleadings; the allegation of termination by itself requires this conclusion.

### (5) Whether Defendant would have reached the same employment decisions in the absence of protected speech

Defendants argue that the Complaint is deficient for making conclusory assertions that Defendants would not have taken adverse action in the absence of Plaintiff's protected speech, and for failure to support this assertion with factual allegations.  [Doc. 19, p. 11; Doc. 40, p. 10]  The fifth *Garcetti/Pickering* element is an affirmative defense, on which Defendants bear the burden of proving by a preponderance of the evidence that it would have reached the same

employment decision in the absence of the protected speech.  *Meyers v. E. Okla. Cnty. Tech. Ctr.*, 776 F.3d 1201, 1206 (10th Cir. 2015); *Trant*, 754 F.3d at 1167 (stating that summary judgment is appropriate when any reasonable jury would find any retaliatory motive was not but-for cause of adverse action); *see Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 285-87 (1977).  Even on a summary judgment motion, it "does not fall to the plaintiff … to demonstrate that the defendant would have acted differently absent the plaintiff's protected speech." *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005).  Once the plaintiff demonstrates that protected speech substantially motivated the employer's adverse action, the plaintiff has met her burden; the burden then shifts to the employer to show that it would have reached the same decision regardless of the plaintiff's speech.  *Id*. at 1222.

Defendants appear to be arguing that the Complaint was required to show that Plaintiff was terminated because of protected speech, and not because of poor performance and student complaints.  The Complaint is not required to rebut a possible affirmative defense.  To survive a motion for judgment on the pleadings, the Complaint is only required to present sufficient allegations, taken as true, to "state a claim to relief that is plausible." *Twombly,* 550 U.S. at 570.  The Court concludes that, under the applicable standard, the Complaint states a plausible claim that Defendants would not have reached the same employment decisions in the absence of Plaintiff's speech.

### (6) First Amendment Claim as a Private Citizen Under Count I

Plaintiff claims that Defendants also violated her First Amendment right of free speech as a private citizen—although there is no separate count; this is included under Count I.  [Doc. 33, pp. 5-6]  The factual allegations are against Cleveland alone, and Plaintiff's response appears to limit this claim to Cleveland.  [Doc. 1, pp. 11-12, ¶¶ 66-68; Doc. 33, p. 15]

A prima facie case of unlawful retaliation against a private citizen for exercising her First Amendment rights requires a showing that: (1) she engaged in constitutionally protected First Amendment activity; (2) the defendant took adverse action against her that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was substantially motivated by the plaintiff's protected activity. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *see Leverington v. City of Colo. Springs*, 643 F.3d 719, 729 (10th Cir. 2011).

The Complaint alleges that Plaintiff exercised her right to free speech at the January 29, 2013 school board meeting, claiming that RRPS had not followed the state regulations on selection of board members, and arguing that a new board member chosen via improper procedure would have a conflict of interest. Just nine days later, and almost one year after knowing of the supporting facts, Cleveland filed an ethics complaint against Plaintiff and requested the New Mexico Public Education Department to revoke Plaintiff's teaching licenses. The Court concludes that Cleveland's alleged actions would chill a person of ordinary firmness from continuing to exercise her free speech rights. *See Worrell*, 219 F.3d at 1213 (concluding that reasonable factfinder could conclude that causing loss of a job offer and adverse impact on career prospects could establish second element). The Court concludes that the Complaint sufficiently alleges the third element, because of the very close temporal proximity (nine days). *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). In addition to the close temporal proximity, the allegation that Cleveland took the adverse action at that time— having been in possession of the supporting facts for almost one year—supports the assertion that Plaintiff's speech was a substantial motivating factor; a reasonable factfinder could be dubious if Cleveland suggested her action was not based on Plaintiff's speech at that January 29,

2013 meeting.  *See Seifert*, 2015 WL 846208, *10-12 (holding that adverse action six days later, together with explanation of which reasonable factfinder could be dubious, was sufficient even on summary judgment to satisfy fourth *Garcetti/Pickering* element).  Evidence that the plaintiff's speech implicates the employer in wrongdoing or serious misconduct provides support for an inference of retaliatory motive and strengthens the causal connection.  *Maestas*, 416 F.3d at 1189.

In *Leverington*, the Tenth Circuit suggested that the speech must involve a matter of public concern to be protected, as under the *Garcetti/Pickering* test, but found it unnecessary to resolve that question; it was sufficient for the *Leverington* Court to conclude that the law was not clearly established and thus the defendant was entitled to qualified immunity.  *Leverington*, 643 F.3d at 733.  In contrast, in Plaintiff's case her speech did involve a matter of public concern; the allegation that RRPS failed to follow state regulations charged official impropriety and wrongdoing, which "usually involve matters of public concern."  *Brammer-Hoelter*, 492 F.3d at 1205; *see Trant*, 754 F.3d at 1165 (asserting irregularity in grand jury investigation into public agency's alleged misconduct).  *Leverington* shows that the right was clearly established if the speech did involve a matter of public concern.

The Court concludes that, as against Defendant Cleveland only, Count I states an alternative claim for violating Plaintiff's clearly established right to be free from an adverse action.  Cleveland is not entitled to qualified immunity with respect to this claim under Count I.

### (7)  Conclusion on Count I

The Court concludes that the Complaint states a claim for First Amendment retaliation because of protected speech.  The Complaint sufficiently alleges that each of the three individual Defendants committed or caused a constitutional violation, and that the protected right was

clearly established at the time.  *See Schuler*, 189 F.3d at 1309.  Defendants are not entitled to qualified immunity.

### G.  Count II

The Complaint asserts that Cleveland, Passell, and Poutsch retaliated against Plaintiff for her association with the teachers' union and her actions as the union representative at ERMS. Defendants argue that the Complaint fails to show that Defendants took any adverse actions because Plaintiff was in the teachers' union or speaking as union representative, pointing out that Plaintiff was in the teachers' union for four years before being terminated.  [Doc. 19, p. 26]

The five-pronged *Garcetti/Pickering* analysis governs Plaintiff's claims under Count II. *Cillo v. City of Greenwood Village*, 739 F.3d 451, 460 (10th Cir. 2013).

The *Cillo* Court stated that it was not clear, after *Shrum*, whether the First Amendment activity must involve a matter of public concern for a claim of retaliation based on union association.  *Id.* at 461 n.17; *see Shrum v. City of Coweta*, 449 F.3d 1132, 1138 (10th Cir. 2006). In *Merrifield*, the Tenth Circuit held that the public concern requirement does apply when a government employee claims retaliation because of exercise of the freedom of association not involving a union.  *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1081-82 (10th Cir. 2011) (involving retention of attorney).  As in *Cillo*, the Court need not decide at this point whether a matter of public concern is required for Count II of the Complaint before the Court; there is only one count of retaliation based on exercise of association with the union and, as discussed above, some of Plaintiff's speech involved matters of public concern.

Defendants argue that Plaintiff was associated with the union from 2005 and that the Complaint alleges retaliation that occurred years later.  [Doc. 19, p. 26]  But the Court notes that Plaintiff became the union representative in August 2008, and began speaking as union

representative at school board meetings from August 2009. Defendants argue that the Complaint lacks factual allegations specifically asserting that Defendants took actions because of Plaintiff's union activities. But motivation is a question of fact; the question is whether an inference of impermissible motive could be made from the factual allegations. *Cillo*, 739 F.3d at 463. In *Cillo*, the plaintiff had started the Union in 2007, but the alleged retaliation did not occur until 2009; the Tenth Circuit held, however, that an inference of anti-union motivation was supported by the close temporal proximity between the time between the "tipping point" (the time at which Union membership surpassed or was about to surpass membership in the Fraternal Order of Police) in 2009 and the plaintiff's termination in 2009. *Id.* at 453, 455, 462, 464-65. Although two years passed between the formation of the Union and the plaintiff's termination, the critical comparison was between the time at which the Union had acquired enough members to be a significant entity and the plaintiff's termination.

As in *Cillo*, the critical comparison is between Plaintiff's termination and the times at which Plaintiff performed various actions as a union representative—not the time when Plaintiff initially joined the union. At least one of Plaintiff's actions as union representative occurred shortly before Defendants initiated the actions necessary to document support for her termination. On February 22, 2012, Plaintiff filed a grievance against Poutsch on behalf of the union. Although many of the complaints raise grievances about internal affairs, at least one complaint raises a matter of public concern—the allegations of misconduct or wrongdoing when Poutsch failed to process teachers' disciplinary referrals for students and destroyed documentation. *See Brammer-Hoelter*, 492 F.3d at 1205; *Trant*, 754 F.3d at 1165; *see also Maestas*, 416 F.3d at 1189 (holding that implicating employer in wrongdoing or serious misconduct supports inference of retaliatory motive and strengthens causal connection. On

42

February 27th, Poutsch placed Plaintiff on administrative leave.  On February 28th and March 1st, Poutsch solicited student complaints about Plaintiff, and did so in an allegedly biased and improper manner.  The Court recognizes that additional time passed before Plaintiff was actually terminated, but considers the timing nevertheless supports an inference of causation because additional time was required to go through the process of termination; the time at which the process was set into motion is more relevant here.

The Complaint alleges that Plaintiff engaged in a series of speech as a union representative, and that Defendants engaged in a series of discouraging actions—even if not all amounted to adverse actions significant enough to be individually recognized under *Garcetti/Pickering*.  The Court concludes that these series provide additional support that Plaintiff's union activities were a substantial motivating factor.  *See Cillo*, 739 F.3d at 464 (taking into account Union's vocal and relentless criticism of defendants, over time).

### (2)  Conclusion on Count II

The Court concludes, largely for the same reasons discussed above regarding Count I, that the Complaint states a claim for retaliation because of Plaintiff's exercise of her right to associate with the teachers' union.  The Complaint sufficiently alleges that each of the three individual Defendants committed or caused a constitutional violation, and that the protected right was clearly established at the time.  *See Morfin*, 906 F.2d at 1438-39; *Cillo*, 739 F.3d at 466.  Defendants are not entitled to qualified immunity on Count II.  The motion to dismiss Count II will be denied.

### H.  Count III

The Complaint asserts that Cleveland, Passell, and Poutsch retaliated against Plaintiff for filing numerous grievances on behalf of school employees, some of which involved matters of

public concern:  the presence of mold at ERMS and the threats mold posed to the health of students and teachers; and the District's failure to follow its student discipline policies, resulting in unsafe working conditions for ERMS teachers.  Defendants limit their motion to dismiss to two arguments:  (1) that the Complaint fails to meet the pleading standards of *Twombly* and *Robbins*; and (2) some of the subjects of Plaintiff's petitions were not matters of public concern. [Doc. 19, p. 20]

Regarding Defendants' first argument, the Court reaches the same conclusion as for Counts I and II, as discussed above.  The Complaint adequately alleges "*who* did *what* to *whom*."

The five-pronged *Garcetti/Pickering* analysis governs Plaintiff's claims under Count III. *Fields v. City of Tulsa*, 753 F.3d 1000, 1013 n.1 (10th Cir. 2014); *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990); *see Bourough of Duryea v. Guarnieri*, ___ U.S. ___, 131 S. Ct. 2488, 2494-95, 180 L. Ed. 2d 408 (2011).  The public concern requirement applies for employee claims of retaliation based on exercise of the right to petition.  *Guarnieri*, ___ U.S. ___, ___, 131 S. Ct. 2488, 2495, 180 L. Ed. 2d 408 (2011); *Merrifield*, 654 F.3d at 1080.  The scope of the public concern requirement is the same for the First Amendment speech clause as for the petition clause.  *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011).

Defendants agree that the issue of mold at ERMS was a matter of public concern.  [Doc. 19, p. 16]  Between February and March 2011 Plaintiff contacted the United States Department of Health and Human Services regarding the existence of mold.  After that date, the Complaint alleges a number of acts by each of the individual Defendants which constituted retaliation for protected conduct, as discussed above under Counts I and II.

Plaintiff's response argues that her February 22, 2012 grievance involved matters of public concern.  [Doc. 33, p. 23]  This grievance, filed on behalf of more than twenty ERMS

teachers and staff against Poutsch, was not merely a personal grievance.  Although the grievance did include complaints about internal ERMS affairs, including dissatisfaction with a superior's performance—which tend not to be matters of public concern, it also included allegations of misconduct and wrongdoing—which tend to be matters of public concern.  *See Brammer-Hoelter*, 492 F.3d at 1205.   The grievance alleged that Poutsch destroyed documents and improperly handled disciplinary referrals, which could jeopardize the safety of other students and teachers.  *See Oleynikova*, 453 Fed. Appx. at 775 (citing cases showing that matters relating to health and safety are matters of public concern).   "[S]peech disclosing 'any evidence of corruption, impropriety, or other malfeasance' on the part of public officials will generally be of public concern."  *Oleynikova*, 453 Fed. Appx. at 774 (quoting *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)).   The line here is not entirely clear, but the Court concludes that the February 22, 2012 grievance sufficiently raised matters of public concern so that dismissal is not warranted at this point.

On February 27, 2012, Poutsch placed Plaintiff on administrative leave.  On February 28 and March 1, 2012, Poutsch solicited complaints against Plaintiff in an allegedly unfair and biased manner, with the purpose of obtaining evidence to support termination.  Although the termination hearing was held several months later, the suspicious timing and additional facts discussed above in relation to Counts I and II provide additional evidence of causation.

Neither of Defendants' two arguments for dismissal of Count III warrants dismissal at this point in the proceeding.  The Complaint sufficiently alleges that each of the three individual Defendants committed or caused a constitutional violation under the *Garcetti/Pickering* test, largely on the same analysis set forth above under Counts I and II with respect to elements not specifically addressed under Count III.  The Court concludes the Complaint states a claim for

violation of Plaintiff's right to petition for redress of grievances, and that this right was clearly established at the time. *See Penrod*, 94 F.3d at 1404. Defendants are not entitled to qualified immunity on Count III. The motion to dismiss Count III will be denied.

### I. Conclusion on Counts I, II, and III

For the reasons discussed above, the Court will grant the motion to dismiss RRPS as a defendant under Counts I, II, and III. The Court will deny the motion for judgment on the pleadings with respect to Counts I, II, and III against Cleveland, Passell, and Poutsch in their individual capacities, concluding that the Complaint sufficiently asserts violations of clearly established constitutional rights.

### II. Procedural Due Process

Count IV asserts a claim against RRPS and Cleveland. Plaintiff alleges that these Defendants violated her right to procedural due process at the July 2012 pre-termination hearing. Defendants argue that Plaintiff's claim is barred because she failed to exhaust state administrative remedies; as discussed above, exhaustion of administrative remedies is not required for § 1983 claims. *Simmons*, 506 F.3d at 1286; *Hopkins*, 150 F.3d at 1160. Defendants also argue that Plaintiff received all of the process due on this claim.

The Fourteenth Amendment prohibits deprivation of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "An essential principle of due process is that a deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation marks omitted). The Court makes a two-step inquiry to determine whether Plaintiff was denied procedural due process: (1) Whether Plaintiff had a protected

46

interest that would trigger the right to due process; and (2)  Whether the process was adequate. *Meyers*, 776 F.3d at 1208.

A person must be given """some kind of a hearing""" before she is deprived of a protected property interest.  *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (quoting *Loudermill*, 470 U.S. at 542 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972))).  "A full evidentiary hearing is not required prior to an adverse employment action."  *West v. Grand Cnty.*, 967 F.2d 362, 367 (10th Cir. 1992).  Instead, an employee "needs only to be given notice and an opportunity to respond."  *Id*.  These requirements may be satisfied by "informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors," or "even a limited conversation between an employee and his supervisor immediately prior to the employee's termination."  *Riggins*, 572 F.3d at 1108.  A pre-termination hearing "'need not be elaborate,'" because it is only intended to be "'an initial check against mistaken decisions.'"  *West*, 967 F.2d at 367 (quoting *Loudermill*, 470 U.S. at 545-46).  The standards for a pre-termination hearing "are not very stringent."  *Id*. at 368.

"In general, a post-termination hearing is required."  *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254-55 (10th Cir. 2005) (citing *Loudermill*, 470 U.S. at 546-47).  More formal due process protections may be required for a post-termination hearing because definitive factfinding occurs at that time.  *West*, 967 F.2d at 368-69.  In *West*, the Tenth Circuit held that the post-termination hearing was adequate when the employee was able to present testimony and witnesses; the employee was not entitled to an opportunity to confront her accusers or to challenge their evidence, because she made no attempt to require attendance of the witnesses against her.  *Id*. at 369-70.  In another case, the Tenth Circuit held that an employee discharged for disability was denied due process when there was no post-termination hearing or opportunity

47

to appeal; the employee had minimal opportunity to present her side of the case in the pre-termination procedures.  *Copelin-Brown*, 399 F.3d at 1254-55.

The parties agree that Plaintiff could only be terminated for "just cause," since she had been employed for more than three years.  [Doc. 19, p. 22; Doc. 33, p. 32]  *See* NMSA 1978, § 22-10A-24(D) (2003).  Plaintiff thus had a protected property interest in continued employment.  *See Loudermill*, 470 U.S. at 538 (property rights are created not by Constitution, but by independent source such as state law); *Copelin-Brown*, 399 F.3d at 1254-55 (holding employee had property interest when employment could only be terminated for specified reasons).

The Complaint alleges that a hearing was held in July 2012, and that RRPS terminated Plaintiff's employment on August 13, 2012.  [Doc. 1, p. 11, ¶¶ 61, 64]  The Complaint asserts a due process violation at the July 2012 pre-termination hearing.  [Doc. 1, p. 16, ¶ 95]

Count IV is asserted against RRPS only.  The Complaint fails to assert that the alleged deficiencies in pre-termination hearing were the result of an official policy or custom, or constituted a decision by a final policymaker.  *See Monell*, 436 U.S. at 691-94; *Pembaur*, 475 U.S. at 480-83.  The Court will assume arguendo, however, that the Complaint properly named RRPS as a defendant under Count IV.

Count IV asserts the Plaintiff was denied a full and fair opportunity to be heard because of the identity of the hearing officer, because she was "not provided with crucial supporting evidence in a timely meaningful manner," and because she was "denied the ability to cross examine witnesses."  [Doc. 1, p. 16, ¶ 95]

Plaintiff alleges that the hearing officer was the RRPS attorney who had previously advised RRPS on whether there was sufficient evidence to support termination, and who helped prepare the documentation used to support the proposed termination.  [Doc. 1, p. 11, ¶ 62]

48

Plaintiff's response asserts that the hearing officer's prior involvement is sufficient to allow an inference of actual bias.  [Doc. 33, p. 34]  The Court disagrees.  The Complaint provides no factual allegations to support an inference of bias.  "'[A] person claiming bias on the part of an administrative tribunal must overcome a presumption of honesty and integrity in those serving as adjudicators'"; "'substantial showing of personal bias is required to disqualify a hearing officer or tribunal.'"  *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 481 (10th Cir. 2011) (quoting *Riggins*, 572 F.3d at 1112).  The Complaint contains no allegations that the RRPS attorney was actually biased.  Assuming the Complaint's factual allegations to be true, and allowing all reasonable inferences, Plaintiff has not shown that she would be entitled to relief on a claim of a tribunal that was not impartial.  The Complaint's conclusory assertion of bias, without supporting factual allegations, is insufficient to state a claim.  *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678-79.

The Complaint further alleges:  "Prior to her termination hearing, the Defendants did not provide the Plaintiff with complete copies of the documents it was using to support her termination and provided those exhibits to her on the morning of the first day of her hearing." [Doc. 1, p. 11, ¶ 63]  The Complaint contains only conclusory assertions that Plaintiff was not provided with "crucial supporting evidence in a timely meaningful manner" and that she was denied the ability to cross-examine witnesses.  [Doc. 1, p. 16, ¶ 95]  The Complaint fails to include factual allegations to support these conclusory assertions.  The Complaint fails to identify the "crucial supporting evidence" or witnesses, and fails to suggest how earlier access to documentation or provision of cross-examination would have made a difference.  Without supporting factual content, the Complaint's conclusory assertions of a violation fail to state a claim.  *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678-79.

The Complaint asserts that Plaintiff was denied the ability to cross examine witnesses. But Plaintiff fails to state which witnesses, and what testimony she may have been able to elicit; most important, the Complaint fails to state that Plaintiff was prevented from cross-examining critical witnesses who were at the hearing, or that critical witnesses were missing and that she had attempted to require their presence at the hearing. *See Cypert*, 661 F.3d at 482 (holding that when plaintiff was not prevented from calling a missing witness, she cannot claim due process violation for lack of cross-examination); *West*, 967 F.2d at 369 (concluding that plaintiff could not complain of inability to cross-examine witness without showing she sought to require witness's attendance at grievance hearing and was restricted from doing so).

The response contends that Plaintiff was not made aware of the allegations themselves before the hearing. [Doc 33, p. 33]  But this is not what the Complaint asserts.  There are no factual allegations in the Complaint that, before the hearing, Plaintiff was not even aware of the allegations.  The Complaint, instead, alleges that "Defendants did not provide the Plaintiff with complete copies of the documents it was using to support her termination and provided those exhibits to her on the morning of the first day of her hearing."  [Doc. 1, p. 11, ¶ 63]  Absent an amendment to the Complaint, the Court will not consider such an expansion of the allegations. At any event, Plaintiff was not entitled "'to some type of "pre-notification notice" of the charges'" or "'a delay between the "notice" and the "opportunity to respond."'"  *Merrifield*, 654 F.3d at 1078 (quoting *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989)).

Plaintiff's challenge is to the July 2012 pre-termination hearing; Plaintiff was not actually terminated until August 13, 2012.   A full evidentiary hearing was not required before termination.  *See West*, 967 F.2d at 367.  Informal proceedings are sufficient.  *Riggins*, 572 F.3d at 1108.  An employee "needs only to be given notice and an opportunity to respond."  *West*, 967

F.2d at 367.  Given the "not very stringent" standards for a pre-termination hearing, the Court concludes that Plaintiff was afforded adequate notice and opportunity to respond.  *West*, 967 F.2d at 368; *see Loudermill*, 470 U.S. at 545-46.

Defendants assert that Plaintiff, represented by counsel, participated in a pre-termination hearing about ten hours long, conducted in accordance with NMSA 1978, § 22-10A-27, in which evidence and testimony were introduced and witnesses were cross-examined by both sides. [Doc. 19, p. 23]   Plaintiff responds that Defendants improperly refer to facts outside the Complaint.  [Doc. 33, p. 34]  The Court agrees that the Complaint does not include factual allegations about these matters; the Court does not base its decision on the additional facts asserted by Defendants.

Defendants also argue that dismissal of Count IV is required because Plaintiff failed to exhaust state administrative remedies.  [Doc. 19, p. 22]  But exhaustion is not required when a plaintiff asserts § 1983 claims.  *Simmons*, 506 F.3d at 1286 (holding exhaustion not required for § 1983 claim of due process violation on employment termination); *Hopkins*, 150 F.3d at 1160 (stating that exhaustion not required because § 1983 is intended to provide supplemental remedy to any state remedy).

The Court concludes that Count IV fails to state a claim, because it contains mere conclusory assertions without supporting factual content.  *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678-79.  As an independent and alternative ground, the Court concludes that Plaintiff was given adequate notice and opportunity to be heard at her pre-termination hearing.  For these reasons, the Court will grant Defendants' motion to dismiss Count IV.

### III. Whistleblower Protection Act

Count V asserts a claim under New Mexico's Whistleblower Protection Act ("NMWPA").  NMSA 1978, §§ 10-16C-1 to -6 (2010) (applicable for acts occurring on or after July 1, 2008.  Count V is asserted against Cleveland and RRPS, claiming that disciplinary actions and termination of Plaintiff constitute retaliatory actions for Plaintiff's speech regarding: the existence of mold at ERMS and the danger to the health and welfare of students and teachers; Cleveland's improper receipt of public school funds; irregularities and conflict of interest regarding curriculum selection; improper use of RRPS facilities and equipment by RRPS food service contractor; and Cleveland's false statements about obtaining a waiver of class size limitations.

Defendants that Count V should be dismissed as failing to state a claim.  [Doc. 19, pp. 27-32]  First, Defendants argue that the Complaint fails to allege specific acts by each Defendant, as required by *Twombly* and *Robbins*.  For the same reasons discussed above with regard to Counts I, II, and III, the Court rejects Defendants' argument that the Complaint presents only conclusory assertions without specifying which Defendant committed which act.  (*See* Section I(E) above.)  Second, Defendants argue that the Complaint fails to allege communication of "an unlawful or improper act."  *See* § 10-16C-3(A).   [Doc. 19, pp. 29-31]  The Court disagrees, and concludes that the acts listed in the preceding paragraph allege "unlawful or improper acts" under the NMWPA:  "malfeasance in public office" or "gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public."   § 10-16(C)-2(E)(2), (3) (defining "unlawful or improper acts").  Third, Defendants argue that Plaintiff cannot claim damages for acts alleged to have occurred before the two-year NMWPA statute of limitations.  *See* § 10-16C-6 (2010).  The Court notes that the retaliatory acts—not Plaintiff's

speech—must occur on or after Feburary 18, 2012.  [Doc. 1 (Complaint filed Feb. 18, 2014)]

Defendants do not dispute that the Complaint alleges at least one retaliatory act within the statute

of limitations:  Plaintiff was terminated on August 13, 2012.

Defendants raise two arguments related to the New Mexico Tort Claims Act

("NMTCA"):  that Plaintiff was required to give notice as provided under the NMTCA, and that

there must be a waiver of immunity under the NMTCA.

The NMWPA was enacted in 2010 (effective date May 19, 2010).  Section 10-16C-4(C)

provides that the remedies provided "are not exclusive and shall be in addition to any other

remedies provided for in any other law or available under common law."  The NMWPA includes

no statement that any provisions of the NMTCA are intended to apply under the NMWPA.

Defendants argue, however, that the notice provision of the NMTCA applies as part of the

NMWPA and that satisfaction of the NMTCA's notice provision must be alleged in the

complaint.  But the authority cited by Defendants addresses the notice provision of the NMTCA

regarding a claim brought under the NMTCA, and in a case decided long before the NMWPA

was enacted.  [Doc. 19, p. 28 (citing *Ferguson v. N.M. State Highway Comm'n*, 1982-NMCA-

180, ¶ 14, 656 P.2d 244, 246-47]  Defendants cite no authority to support this conclusory

argument, and the Court therefore need not address it further.  *See* D.N.M.LR-Civ. 7.3(a)

(requiring motion to cite authority in support of legal positions advanced); *Cahill v. Am. Family

Mut. Ins. Co.*, 610 F.3d 1235, 1238-39 (10th Cir. 2010) (court need not address conclusory

arguments unsupported by citation to relevant authority); *Ariz. Pub. Serv. Co. v. U.S. EPA*, 562

F.3d 1116, 1130 (10th Cir. 2009) (declining to address conclusory argument absent citation to

authority).

Defendants  appear to make a conclusory argument that immunity must be waived under the NMTCA before Plaintiff can bring a claim under the NMWPA.  [Doc. 19, p. 28]  Defendants cite caselaw stating that there must be a waiver of immunity under the NMTCA, but the cases address claims brought under the NMTCA; in addition, these cases were issued before the NMWPA was enacted.  [Doc. 19, p. 28 (citing *Sisneros v. Fisher*, 685 F. Supp. 2d 1188 (D.N.M. Jan. 13, 2010); *Ross v. Bd. of Regents*, 599 F.3d 1114 (10th Cir. March 23, 2010)]  In *Ross*, the Tenth Circuit held that immunity was not waived for a claim under the NMTCA, and then addressed claims under the New Mexico Religious Freedom Restoration Act—recognizing that the latter included its own waiver of immunity and making no suggestion that waiver of immunity under the NMTCA was required or relevant.  *Ross*, 599 F.3d at 1117-18.   The NMWPA includes its own waiver of immunity, explicitly allowing allows claims against "any department, agency, office, institution, board, commission, committee, branch or district of state government," or "any political subdivision of the state."   NMSA 1978, § 10-16C-2(C)(1), (2). Cases not addressing the NMWPA and issued before enactment of the NMWPA cannot support Defendants' conclusory argument.  Defendants do not cite relevant authority that a waiver of immunity under the NMTCA is required for a claim brought under the NMWPA.  *See* D.N.M.LR-Civ. 7.3(a); *Cahill*, 610 F.3d at 1238-39 (court need not address conclusory argument unsupported by relevant authority); *Ariz. Pub. Serv. Co.*, 562 F.3d at 1130 (declining to address conclusory argument absent citation to authority).

Finally, Defendants argue that Plaintiff's claim under the NMWPA should be dismissed because Plaintiff failed to exhaust administrative remedies under the Public Employee Bargaining Act and School Personnel Act.  [Doc. 19, p. 28]  Relying on *Weise*, Defendants argue that a claim under the NMWPA should not "duplicate the rights that were already available" to

Plaintiff.  [Doc. 19, pp. 28-29]  *Weise v. Wash. Tru Solutions, L.L.C.*, 2008-NMCA-121, ¶ 26, 192 P.3d 1244, 1254.  In addition to being decided before the NMWPA was enacted, *Weise* addressed availability of the common law tort of retaliatory discharge to an employee covered by a collective bargaining act.  *Id.* (citing *Silva v. Am. Fed. of State, Cnty. & Mun. Emps.*, 2001-NMSC-038, ¶¶ 10-11, 37 P.3d 81, 83 (discussing common law tort)).  *Weise* is inapposite.

The NMWPA includes no provision requiring exhaustion of other remedies.  On the contrary, § 10-16C-4(C) of the NMWPA demonstrates an intent to allow duplication of other remedies—providing that the remedies established "are not exclusive and shall be in addition to any other remedies provided for in any other law or available under common law."  Thus the plain language of the NMWPA strongly supports the conclusion that exhaustion is not required.  The Court recently reached this conclusion in *Randall v. State of N.M. Pub. Defender*, Civ. No. 13-398 CG/LAM (D.N.M. Nov. 5, 2014) [Doc. 81, pp. 10-16] (addressing State Personnel Act), *appeal filed on other grounds*, No. 14-2217 (10th Cir. 2015).  The Court finds persuasive this memorandum order and opinion and reaches the same conclusion.

The NMWPA allows actual damages, reinstatement with the same seniority status, two times the amount of back pay with interest, special damages, and litigation costs and attorney fees to a prevailing plaintiff.  § 10-16C-4(A).  The School Personnel Act, like the State Personnel Act, allows damages of reinstatement and back pay.  NMSA 1978, § 22-10A-29(B) (2003); NMSA 1978, § 22-10A-25(N) (2003);[5] NMSA 1978, § 10-9-18(F) (2009).  Defendants suggest no reasonable reconciliation of these different provisions on damages.  As in *Randall*, a requirement of exhaustion would illogically limit a plaintiff prevailing under the School (or State) Personnel Act to lesser damages than she could obtain under the NMWPA—and a plaintiff

---

[5] Defendants' motion cited § 22-10A-25 in their argument on exhaustion.  [Doc. 19, p. 28]  Plaintiff did not correct this citation in her response.  It appears to the Court that the applicable sections of the School Personnel Act are §§ 22-10A-27 to -29.

losing under the School (or State) Personnel Act would have the opportunity to obtain greater damages under the NMWPA. *Randall*, Civ. No. 13-398, pp. 13-14. The more logical interpretation is that the New Mexico Legislature enacted the NMWPA to afford special protection to whistleblowers and that exhaustion is not required. *Id.* p. 14. The Court observed that the Legislative Finance Committee's Fiscal Impact Report shows that the New Mexico Legislature was aware of the duplication and greater remedies under the NMWPA. *Id.* at 15. The Report further supports *Randall*'s conclusion that exhaustion is not required. *Cf. Trant*, 754 F.3d at 1174 n.9 (suggesting that Oklahoma Whistleblower Act does not appear to require exhaustion of administration remedies, because statute does not include explicit provision for exhaustion).

The Court will deny Defendants' motion to dismiss Count V.

## IV. Punitive Damages

The Complaint requests punitive damages under Counts I, II, III, and V. Defendants argue that punitive damages are not available against a governmental entity (RRPS), against Defendants in their official capacities, or under the WPA. [Doc. 19, pp. 32-33] Plaintiff's response clarifies the Complaint, stating that Plaintiff does not assert any claims against the individual Defendants in their official capacities. [Doc. 33, p. 1 n.1] The response further states that Plaintiff does not assert any claims for punitive damages against RRPS, or against any Defendant under the WPA. [Doc. 33, p. 1 n.1 (despite the Complaint's claim for punitives under WPA [Doc. 1, p. 17]).

Given Plaintiff's response, the Court concludes that the only claims for punitive damages asserted are against Cleveland, Passell, and Poutsch in their individual capacities under Counts I, II, and III. The Court makes no determination at this time regarding Plaintiff's proof or

entitlement to punitive damages against the individual defendants at this time, but merely accepts Plaintiff's clarification that these are the only punitive damages requested in the Complaint.

## CONCLUSION

The Court grants Defendants' motion to dismiss Counts I, II, and III of the Complaint as against Defendant RRPS; however, the Court grants Plaintiff leave to amend the Complaint, with any amended complaint to be filed on or before April 14, 2015.  The Court grants Defendants' motion to dismiss Count IV.  Defendants' motion [Doc. 19] is otherwise denied.

The claims remaining in the case are:  Counts I, II, and III against Cleveland, Passell, and Poutsch in their individual capacities; and Count V against Defendants RRPS and Cleveland.


**IT IS THEREFORE ORDERED** that:

(I)  *Defendants Sarah Poutsch, Susan Passell, Susan Cleveland and Rio Rancho Public Schools' Motion for Judgment on the Pleadings and/or for Qualified Immunity and Memorandum in Support Thereof* [Doc. 19] is **GRANTED in part**, and **DENIED in part**, as discussed above;

(II)  *Defendants' Unopposed Motion To Correct Citations* [Doc. 48] is **GRANTED in part**, and **DENIED in part**.


_____
UNITED STATES DISTRICT JUDGE